J-S33015-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN RE: J.W.J., III, M.N.J., MINORS | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: J.W.J., FATHER | No. 1780 WDA 2015 |

Appeal from the Order October 15, 2015
in the Court of Common Pleas of Allegheny County Family Court
at No(s): CP-02-AP-0000054-2015
CP-02-AP-0000055-2015

BEFORE: GANTMAN, P.J., OLSON, J., and FITZGERALD,[*] J.

MEMORANDUM BY FITZGERALD, J.:         **FILED JULY 15, 2016**

J.W.J. ("Father") appeals from the orders entered on October 14, 2015, granting the petitions filed by the Allegheny County Children, Youth and Families ("CYF") to involuntarily terminate his parental rights to his dependent, minor, male children, J.W.J., III, born in October of 2011, and M.N.J., born in November of 2013 (collectively, the "Children"), pursuant to the Adoption Act, 23 Pa.C.S. § 2511(a)(2), (5), (8), and (b).[1] We affirm.

On March 10, 2015, CYF filed the involuntary termination petitions at issue. On October 14, 2015, the trial court held a hearing. CYF first

---

[*] Former Justice specially assigned to the Superior Court.

[1] In the same orders entered on October 15, 2015, the trial court involuntarily terminated the parental rights of H.M.M., the natural mother of the Children ("Mother"). Mother was absent from the termination hearing, but was represented by counsel, and the court proceeded with the hearing in her absence. Trial Ct. Op., 12/18/15, at 1 n.1. Mother has not filed an appeal of her own and is not a party to this appeal.

presented Terry O'Hara, Ph.D.,[2] as a stipulated expert in the area of psychology. N.T., 10/14/15, at 9. CYF then presented the testimony of Terese Tuminello, a CYF caseworker assigned to the case since January of 2014. *Id.* at 65. Father, who was incarcerated, was present in the courtroom, and testified on his own behalf. He also presented the testimony, via telephone, of A.P., his fiancée, with whom he resides when he is not incarcerated. *Id.* at 221, 232.

Based on the testimony of Ms. Tuminello, the trial court made the following findings of fact:

> The family had been involved with CYF prior to the births of J.J. and M.J. [N.T., 10/14/15, at 67.] These children are two of Mother's seven children; they have four older siblings. *Id.*, at 66. Mother has no children in her care. *Id.* When CYF first became involved, Mother was grappling with alcohol, while Father was in the Allegheny County Jail. *Id.*, at 68. But at that time, in-home services were working with Mother, and the case was closed in October of 2010. *Id.*
>
> As time progressed, Mother continued to struggle with her sobriety. CYF obtained Emergency Custody Authorizations ("ECAs") to remove the subject children. J.J. was removed on January 7, 2013. *Id.*, at 74. But he was temporarily returned to Mother in October 2013. In January 2014, an incident took place where Mother was arrested for DUI while she was driving with her three small children, including the newborn baby M.J. None of the children were [sic] properly restrained in car seats. CYF obtained ECAs for the children and J.J. was adjudicated dependent on January 28, 2014. M.J. was adjudicated

_____

[2] The notes of testimony erroneously refer to Dr. Terry O'Hara as Dr. Tony O'Hara.

> [dependent] three months later on March 24, 2014. ***Id.*** Mother stipulated to her current alcohol abuse, need for domestic violence treatment, and her significant history with the agency. ***Id.***, at 75.

Trial Ct. Op. at 1-2.

Dr. O'Hara conducted an interactional evaluation of Children with their maternal uncle, T.L., who is their kinship foster parent, on September 22, 2015, and produced a report concerning that evaluation. ***Id.*** at 11. CYF's counsel questioned Dr. O'Hara about his observations and recommendations after his interactional observation of Children with T.L. ***Id.*** at 15. Father's counsel objected, asserting that CYF had to present its case as to Section 2511(a) before questioning Dr. O'Hara about matters that were relevant to Section 2511(b). ***Id.*** at 15-16. The trial court overruled the objection, and denied any request for bifurcation of the presentation of testimony and evidence. ***Id.*** at 17. The trial court judge stated that she could appropriately address the evidence. ***Id.*** T.L.'s partner, Ms. M., was unable to attend the evaluation. ***Id.*** at 25.

Mother failed to appear at the evaluations scheduled to occur with Dr. O'Hara on September 28, 2015. ***Id.*** at 11, 14. Father failed to appear for an interactional evaluation between Father and Children scheduled for September 30, 2015, and for an individual evaluation scheduled with Dr. O'Hara for that same date. ***Id.*** at 11, 14-15. Father did not notify Dr. O'Hara about re-scheduling the evaluations. ***Id.*** at 14. Dr. O'Hara has never seen Father. ***Id.*** at 15.

Dr. O'Hara testified about information he received from Ms. O'Neill from the Baer Foundation, who visited T.L. and Ms. M. interacting as a family with Children multiple times. *Id.* at 18. Father's counsel objected on the basis of hearsay. *Id.* The trial court permitted Father's counsel to conduct *voir dire* examination concerning the collateral information Dr. O'Hara relied upon in forming his opinion. *Id.* at 22-23. Dr. O'Hara explained that he relied upon information from CYF, his own observations of Children with T.L., and research regarding attachment. *Id.* at 23. Dr. O'Hara stated that the failure of Father and Mother to appear at the evaluations limited him in forming his opinions and recommendations. *Id.* Father's counsel then withdrew her objection. *Id.*

Ms. O'Neill related to Dr. O'Hara that T.L. is "wonderful" and really loves and cares for Children, and that T.L.'s home is the only home Children have known. *Id.* at 24. Ms. O'Neill related that Ms. M. assisted in Children's lives, and "seems to really love and care for the kids." *Id.* Dr. O'Hara observed that T.L. (1) shows stability, (2) denies substance abuse, mental health concerns, domestic violence, and criminal activity, and (3) denies that Ms. M. has any of these issues. *Id.* T.L. also reportedly has stability in his housing and employment. *Id.* T.L. and his mother, S.M., Children's maternal grandmother, both allegedly have a strong family, and Children are able spend time with their sister, Z. *Id.*

Dr. O'Hara observed that T.L. exhibited several positive parenting skills with Children in the interactional evaluation. *Id.* at 25. Specifically, T.L. interacted well with Children, read to M.N.J., consistently spoke to Children, praised them, gained their compliance, and showed affection. *Id.* at 25-26. J.W.J., III, was asleep for most of the evaluation, and appeared to be tired when awakened. *Id.* at 26. Dr. O'Hara observed that J.W.J., III, responded positively to T.L.'s directions, but slowly, as he was sleepy. *Id.* M.N.J. was spontaneous and frequent in his interactions with T.L., and he exhibited autonomy and curiosity. *Id.* M.N.J. made a variety of vocalizations, and was calm and relaxed with T.L. *Id.* Dr. O'Hara assessed T.L. as showing several positive parenting skills and exhibiting stability, and Children exhibited their attachment to him. *Id.* Dr. O'Hara believed that J.W.J., III, was tired because of the long drive, and that the evaluation occurred during his naptime. *Id.* at 27.

Dr. O'Hara opined that the benefits of keeping Children with T.L. for adoption outweighed any detriment from terminating the parental rights of Father. *Id.* at 27. Dr. O'Hara made this recommendation without conducting any evaluation of Father, as Father had not appeared for his evaluations. *Id.* at 27. Dr. O'Hara based his recommendations on information he received from CYF and his own research regarding Father's extensive criminal history, which he recounted for the court. *Id.* at 27-29. Father's counsel stipulated that Dr. O'Hara relied on the record regarding

Father's criminal history, and that there was no need for Dr. O'Hara to testify as to the complete criminal history. *Id.* at 29.

Dr. O'Hara was concerned that in 2008, Father had engaged in fighting, which was a risk factor for future aggressive behaviors. *Id.* at 30. Dr. O'Hara explained that Father's failure to appear for the evaluations made it difficult for him to make a recommendation as to whether Father is able to appropriately care for the needs and welfare of Children. *Id.* at 31. Dr. O'Hara was concerned that Father had been convicted of numerous assaults, pled guilty to multiple terroristic threat charges, and had significant convictions related to drug activity. *Id.* Based on Father's criminal history, Dr. O'Hara opined that prior to unsupervised visitation with Children, Father would have to make significant progress with regard to anger management and substance abuse counseling. *Id.* at 32. In preparing his report, Dr. O'Hara considered information from CYF that Father had not visited Children for some time. *Id.* Dr. O'Hara made his recommendation with a reasonable degree of scientific certainty. *Id.*

On cross-examination by Father's counsel, Dr. O'Hara stated that he did not know that Children would not be attending the September 30, 2015 interactional evaluation. *Id.* at 32-33. Dr. O'Hara was not provided any information that Mother made false reports against Father that resulted in arrests but with some charges dismissed. *Id.* at 37-39. Dr. O'Hara did not know the reason why Father absconded from a halfway house in 2013. *Id.*

at 39. Dr. O'Hara stated that a person involved with drugs could be rehabilitated, but would need to commit to participating in services over a period of time. *Id.* at 40. Additionally, Dr. O'Hara would need to consider the coping skills of the individual, his employment status, any history of domestic violence, and any probation violations. *Id.* He stated that in his experience, parenting and domestic violence programs are of limited use and effectiveness. *Id.* at 42.

In response to cross-examination by Mother's counsel, Dr. O'Hara testified that his recommendation was based on the collateral information, but he had no evidence that either parent was in a position to appropriately care for Children's needs and welfare. *Id.* at 46. In contrast, he had evidence that Children were exhibiting "secure components of secured passions" with their kinship foster parents and were in a stable placement, and that their kinship foster parents were exhibiting several positive parenting skills. *Id.*

On further examination by counsel for Children, Dr. O'Hara testified concerning the impact of the removal from Mother on Children. *Id.* at 51. On re-cross-examination by Father's counsel, Dr. O'Hara stated that he did not have any information that Father was informally visiting with Children or that Father provided gifts for Children. *Id.* at 58-59. Dr. O'Hara clarified for the court that he understood from CYF that there had been no visits between Children and their biological parents, but he was unaware of any informal

visitation between Father and Children. *Id.* at 59. On re-cross-examination by Mother's counsel, Dr. O'Hara testified that he did not have any concerns about the development of the Children. *Id.* at 60. In response to further questions by counsel for the Children, Dr. O'Hara testified that if a child has a secure attachment with a caregiver or a parental figure, the issues the child has with another caregiver, parent, or parental figure may be mitigated. *Id.* at 62. Dr. O'Hara stated that had he known about informal visitation between Father and Children, his opinion would not change. *Id.* On additional re-direct by counsel for CYF, Dr. O'Hara testified that it would have been beneficial for Father to attend his individual evaluation, as he would have gathered more data upon which to base his opinion and recommendations. *Id.* at 63.

Father testified that after his release on November 1, 2012, from the Allegheny County Jail to a halfway house, Renewal Center, he absconded and went on the run beginning January 26, 2013, and ending on March 11, 2013. N.T. at 163-67. Father claimed that he left Renewal Center because he believed that Children were in danger from Mother's drunkenness and inappropriate people in Mother's home. *Id.* at 163-65. Father claimed that while on the run, he saw Children twice at their maternal grandmother's home, and that he made certain they had appropriate clothing for the season and brought them food. *Id.* at 165-66. Father was re-incarcerated on March 11, 2013, until September 11, 2013. *Id.* He was released to

Gateway Braddock to complete the requirements he failed to fulfill at Renewal Center because he had absconded. *Id.* at 167-69. Father testified that he completed a 45-day violence prevention class at Renewal Center, but did not have the certificate of completion, as he absconded from Gateway Braddock. *Id.* at 169-70.

Regarding his contact with CYF, Father testified that he had contact with CYF when he was in Renewal Center in 2012. *Id.* at 171. After Father absconded from Renewal Center and was re-incarcerated at SCI-Pine Grove, he next had contact with CYF in August of 2013. *Id.* He received a letter in July or August of 2013 informing him that a counselor could be present, via video, for a court conference. *Id.* Father stated that he was not transported to court for the conference and did not participate via video. *Id.* Father testified that he next heard from CYF in February, March, and April of 2015. *Id.* at 172.

Father stated that he was released from prison on September 11, 2013, and then was in Gateway Braddock for approximately one month. *Id.* at 171-72. Father explained that Mother contacted the police, and accused him of punching her in the face at a bus stop. *Id.* at 172-73. Father then failed to report to Gateway Braddock, was placed on the absconders list in October of 2013, and was on the run for the entire year of 2014, until he was arrested on January 8, 2015. *Id.* at 172-73. Father claimed that while on the run during 2014, he informally visited Children at the home of their

maternal grandmother, and would purchase clothing, food, toys, and holiday items for them. *Id.* at 173-74. Father explained that he was taken into custody in January of 2015 while he was doing construction work "under the table." *Id.* at 175.

Father testified that he was unaware of his Family Service Plan ("FSP") goals until a conference held in March of 2015. *Id.* Father stated that he received paperwork from Ms. Tuminello from March 2015 until April 2015. *Id.* at 175-76. Father had admitted into evidence, as Father's Exhibit 1, photographs of his home. *Id.* at 176.

Father shares his home with his fiancée, A.P., and her two children. *Id.* at 177. When the trial court ordered Father to refrain from domestic violence, Father engaged in a cognitive behavior therapy class as a requirement of his parole from prison. *Id.* Father claimed that he informed Ms. Tuminello that he had a drug and alcohol evaluation at Renewal Center, and that she responded that she would need to verify that information with Father's parole officer. *Id.* at 178-79. Father testified that in July of 2015, he told Ms. Tuminello that he was willing to do parenting classes, but asked if she could set up an evening time, so that he could work. *Id.* at 179-80. Father stated that he did not receive a response from Ms. Tuminello, and that the only notices that he received from Ms. Tuminello in the mail related to past proceedings. *Id.* at 180.

The trial court ordered Father to visit with Children twice monthly. *Id.* Father's first visit, in August of 2015, was set up for Lexington Center, which has no security. *Id.* at 181. Father's second visit was scheduled to occur at a McDonald's restaurant, but Father claims he was told the visit would occur at an incorrect restaurant. *Id.* Father's visits through September were delayed by his incarceration on charges that he assaulted Mother on August 18, 2015. *Id.* at 182-83. Mother failed to appear in court to testify and support the charges. *Id.* at 183. Father testified that Mother has brought more than seventy charges against him, and that she never comes to court. *Id.* Father stated that he did not want Children to visit him in jail because he does not want them to see him incarcerated. *Id.*

Father explained that he did not attend the interactional evaluation with Children and Dr. O'Hara because Ms. Tuminello told him that Children had not been transported there. *Id.* at 184-85. Father claimed that he sat outside of Dr. O'Hara's office. *Id.* Father denied any drug or alcohol issues. *Id.* at 185. Father also testified that his FSP objectives included staying out of trouble, but that he finds it difficult to comply when Mother makes false reports to police about him. *Id.* at 185-86. Father stated that he has been incarcerated for criminal conspiracy, selling drugs, possessing drugs with the intent to deliver and manufacturing, and receiving stolen property for a handgun police found in a residence when they did a drug raid. *Id.* at 186. Father testified that the remainder of his incarcerations were because Mother

made false reports about him to police and because he left the halfway house to care for Children. *Id.* Father stated that he maintained contact with CYF, as required by his FSP objectives, but it was a "hassle" because Ms. Tuminello is always on vacation. *Id.* at 186-87.

Father testified that he is employed, and works until 4:30 p.m. *Id.* at 187. Father stated that his last visit was on September 26, 2015, and that he had requested additional visits. *Id.* at 188-89. Father stated that he had played games with Children and brought them snacks when he visited them at Lexington Center. *Id.* at 190-91. The second visit occurred at a McDonald's restaurant. *Id.* at 192. Father testified that Children know him as their father, and that they love him. *Id.* Father explained that he will complete his probation and parole term on April 2, 2016, and that he has not been in any criminal trouble since his drug charges, aside from false reports filed by Mother. *Id.* at 193-200. He stated that he no longer sells drugs. *Id.* at 194.

On cross-examination by counsel for CYF, and also by counsel for the Children, Father testified that he believed that his parental rights were already terminated prior to 2015. *Id.* at 203, 218. He stated that Mother continuously harassed him by calling his telephone multiple times. *Id.* at 206-07. Father explained that he does not "believe in" attending criminal court proceedings with a public defender, so he had to work. *Id.* at 201. He stated that he did not attend permanency review hearings because he knew

he would be arrested on a warrant if he entered the courthouse. *Id.* at 208. On cross-examination by counsel for Children, Father stated that while he was on the run in 2014, he would see Children "once or twice" a month. *Id.* at 211-21. Father blamed Ms. Tuminello and CYF for not setting up domestic violence and parenting classes for him to attend around his work schedule. *Id.* at 215-216. Father stated that he made efforts to contact CYF between his release from prison on June 25, 2015, and his re-incarceration in September of 2015. *Id.* at 216-17. Father also testified that he gave Children bicycles and that A.P. delivered them. *Id.* at 222.

On October 15, 2015, the trial court entered its orders terminating Father's parental rights to Children pursuant to Section 2511(a)(2), (5), (8), and (b) of the Adoption Act. On November 12, 2015, Father timely filed notices of appeal along with concise statements of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). On November 23, 2015, this Court, acting *sua sponte*, dismissed the appeal at Docket No. 1781 WDA 2015 as duplicative.

In his brief on appeal, Father raises four questions for this Court's review, as follows:

> I. Whether the Trial Court erred and/or abused its discretion in finding that the Office of Children, Youth and Families met their burden of proof and proved by clear and convincing evidence that the parental rights of J.W.J. should be terminated pursuant to 23 Pa.C.S.A. § 2511(a)(2), (5), (8)?

- 13 -

II. Whether the Trial Court erred and/or abused its discretion in finding that the Office of Children, Youth and Families met their burden of proof and proved by clear and convincing evidence that the parental rights of J.W.J. should be terminated pursuant to 23 Pa.C.S.A. § 2511(b)?

III. Whether the Trial Court committed fatal and reversible error and/or abused its discretion by allowing evidence over the objection of Father's [c]ounsel by Dr. Terry O'Hara to testify to matters of which he had no basis and were based on speculation?

IV. Whether the Trial Court committed fatal and reversible error and/or abused its discretion in overruling the objection of Father's [c]ounsel regarding testimony from Dr. Terry O'Hara regarding needs and welfare of the children prior to an establishment that grounds to involuntarily terminate Father's parental rights under 23 Pa.C.S.A. 2511 §§ [sic] (a)(2), (5), (8) were proved by clear and convincing evidence?

Father's Brief at 1.

With regard to Section 2511(a)(2), Father contends that CYF failed to prove by clear and convincing evidence that he did not have the capacity to or could not remedy the conditions that led to the removal of Children. Father's Brief at 8, 23. Father states that Children were removed from Mother, who was their primary caretaker, and that he was incarcerated during most of CYF's involvement with the family. *Id.* Father asserts that his repeated incarceration was the barrier to his caring for Children. *Id.* at 8. He states that Mother caused many of his prior incarcerations because he was protecting Children and that Mother had issues with mental health and alcohol. *Id.* at 3, 8-9, 23. Father contends that he testified credibly that Mother often called the police fabricating events to have him arrested, and

- 14 -

that she harassed him. *Id.* at 9, 23. Thus, Father contends that he is ready, willing, and able to care for Children.

In reviewing an appeal from an order terminating parental rights, we adhere to the following standard:

> [A]ppellate courts must apply an abuse of discretion standard when considering a trial court's determination of a petition for termination of parental rights. As in dependency cases, our standard of review requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. *In re: R.J.T.*, 608 Pa. 9, 26-27, 9 A.3d 1179, 1190 (Pa. 2010). If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. *Id.*; *R.I.S.*, [614 Pa. 275, 284,] 36 A.3d [567,] 572 [(Pa. 2011) (plurality opinion)]. As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. *Id.*; *see also Samuel Bassett v. Kia Motors America, Inc.*, 613 Pa. 371[, 455], 34 A.3d 1, 51 (Pa. 2011); *Christianson v. Ely*, [575 Pa. 647, 654-655], 838 A.2d 630, 634 (Pa. 2003). Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. *Id.*
>
> As we discussed in *R.J.T.*, there are clear reasons for applying an abuse of discretion standard of review in these cases. We observed that, unlike trial courts, appellate courts are not equipped to make the fact-specific determinations on a cold record, where the trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. *R.J.T.*, [608 Pa. at 28-30], 9 A.3d at 1190. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions

are not the result of an error of law or an abuse of discretion. ***In re Adoption of Atencio***, 539 Pa. 161[, 165,] 650 A.2d 1064, 1066 (Pa. 1994).

***In re S.P.***, 47 A.3d 817, 826-27 (Pa. 2012).

The burden is upon the petitioner to prove by clear and convincing evidence that the asserted grounds for seeking the termination of parental rights are valid. ***In re R.N.J.***, 985 A.2d 273, 276 (Pa. Super. 2009).

Moreover, we have explained:

[t]he standard of clear and convincing evidence is defined as testimony that is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue."

***Id.*** (quoting ***In re J.L.C.***, 837 A.2d 1247, 1251 (Pa. Super. 2003)).

This Court may affirm the trial court's decision regarding the termination of parental rights with regard to any one subsection of section 2511(a). ***See In re B.L.W.***, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). The trial court terminated Father's parental rights under Section 2511(a)(2), (5), (8), and (b). We will focus on Section 2511(a)(2) and (b), which provides as follows:

**§ 2511. Grounds for involuntary termination**

**(a) General rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

\* \* \*

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to

> be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> * * *
>
> **(b) Other considerations.—**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511.

This Court has explained that the focus in terminating parental rights under Section 2511(a) is on the parent, but under Section 2511(b), the focus is on the child. *In re C.L.G.*, 956 A.2d 999, 1008 (Pa. Super. 2008) (*en banc*).

Our Supreme Court set forth our inquiry under Section 2511(a)(2) as follows:

> [Section] 2511(a)(2) provides [the] statutory ground[] for termination of parental rights where it is demonstrated by clear and convincing evidence that "[t]he repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent." . . .

[The Supreme Court] has addressed incapacity sufficient for termination under § 2511(a)(2):

> A decision to terminate parental rights, never to be made lightly or without a sense of compassion for the parent, can seldom be more difficult than when termination is based upon parental incapacity. The legislature, however, in enacting the 1970 Adoption Act, concluded that a parent who is incapable of performing parental duties is just as parentally unfit as one who refuses to perform the duties.
>
> *In re Adoption of J.J.*, 515 A.2d 883, 891 (Pa. 1986), *quoting* *In re: William L.*, 383 A.2d 1228, 1239 (Pa. 1978).

*In re S.P.*, 47 A.3d at 827.

This Court has stated that a parent is required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities. *In re A.L.D.* 797 A.2d 326, 340 (Pa. Super. 2002). A parent's vow to cooperate, after a long period of uncooperativeness regarding the necessity or availability of services, may properly be rejected as untimely or disingenuous. *Id.*

In *In re S.P.*, our Supreme Court instructed:

> incarceration is a factor, and indeed can be a determinative factor, in a court's conclusion that grounds for termination exist under § 2511(a)(2) where the repeated and continued incapacity of a parent due to incarceration has caused the child to be without essential parental care, control or subsistence and [] the causes of the incapacity cannot or will not be remedied.

*In re S.P.*, 47 A.3d at 828.

After re-visiting its decision in *In re R.I.S.*, 36 A.3d 567 (Pa. 2011),

regarding incarcerated parents, the Supreme Court stated:

> we now definitively hold that incarceration, while not a litmus test for termination, can be determinative of the question of whether a parent is incapable of providing "essential parental care, control or subsistence" and the length of the remaining confinement can be considered as highly relevant to whether "the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent," sufficient to provide grounds for termination pursuant to 23 [Pa.C.S.] § 2511(a)(2). [*See In re E.A.P.*, 944 A.2d 79, 85 (Pa. Super. 2008)] (holding termination under § 2511(a)(2) supported by mother's repeated incarcerations and failure to be present for child, which caused child to be without essential care and subsistence for most of her life and which cannot be remedied despite mother's compliance with various prison programs). If a court finds grounds for termination under subsection (a)(2), a court must determine whether termination is in the best interests of the child, considering the developmental, physical, and emotional needs and welfare of the child pursuant to § 2511(b). In this regard, trial courts must carefully review the individual circumstances for every child to determine, *inter alia*, how a parent's incarceration will factor into an assessment of the child's best interest.

*In re S.P.*, 47 A.3d at 830-31 (some citations omitted).

The trial court made the following findings of fact regarding Father's

ability to care for Children:

> . . . Father has been unable to care for the [C]hildren, due to his various incarcerations. His criminal history is quite extensive. In 2007 he pled guilty to harassment and disorderly conduct. In 2008 he pled guilty to a felony criminal conspiracy, and manufacture, delivery, possession with intent to manufacture or delivery [sic], possession with intent to manufacture or deliver. In 2011, Father was found guilty of terroristic threats and simple assault and

> resisting arrest. *See* CYF Exhibit D. *See also* [N.T.] at 28-29.
>
> He was incarcerated when J.J. was initially adjudicated dependent. Father was incarcerated between March and May 2013 and then again from July to August 2013. *Id.*, at 107. During the whole of 2014, Father was either incarcerated or had absconded, whereabouts unknown, from a half-way house. *Id.*, at 105; 173. He was incarcerated again from January to June 2015, and then as recently as September 2015, a month before the TPR hearing, at which he was present. *Id.* at 107. There was little, if any[,] contact, [sic] between the [C]hildren and their [f]ather. In fact, Father allegedly insisted that the [C]hildren not visit him while he was incarcerated. *Id.* at 149.
>
> Family Service Plans ("FSPs') are created by CYF for parents in order to facilitate the reunification between parent and child. CYF utilizes goals to measure progress with the FSP. *See* CYF Exhibit E. Although CYF created FSP goals for Father in 2010 and in 2013, Father argues that he was not made aware of these goals until he met with CYF upon his release in July of 2015, before he was incarcerated again in September 2015. *Id.*, at 122.

Trial Ct. Op. at 2-3.

The trial court addressed Father's argument regarding Section 2511(a)(2) as follows.

> To begin with, the [C]hildren – nearly four and two years old at the time of the TPR hearing – have never been in Father's care. Father was largely incarcerated or on [the] run from probation and CYF during the vast majority of this case. He did not attend permanency review hearings because he knew he would be picked up on a warrant if he entered the court house. [N.T., 10/14/15,] at 208. Father claims that he informally visited the [C]hildren at their maternal grandmother's home; and when he did, he parented the [C]hildren by clothing and feeding them. *See* [N.T.], at 166-167. This testimony is not particularly credible, nor [sic] even persuasive. He

only visited them twice between January and March 2013. *Id.* At most, even if this [c]ourt was to believe Father, he only visited the [C]hildren "once or twice a month" during all of 2014. None of these informal visits are [sic] verifiable.

Father claims that his criminal history is behind him, but the facts show anything but. He testified that his days of selling drugs are over. *Id.*, at 194. He argues that any violence he perpetrated against Mother was falsely reported, merely Mother's ploy of getting him in trouble. After an incident where he allegedly punched Mother at a bus stop, Father did not turn himself in upon learning that police would be going to his place of work to arrest him. Father testified that he "doesn't believe in" going to court proceedings for a criminal matter with a public defender. *Id.*, at 201. Instead, he went on [the] run from the police so he could work to retain funds to hire a private counsel. *Id.*

His primary argument is that CYF did not adequately help him reunify with the [C]hildren. He said that he did not have contact with CYF until August 2013. *Id.*, at 171. At trial, Father seemingly argued that CYF could not prove its burden, because the agency could not locate him, and because they could not locate him while he was on [the] run from his incarceration, they could not give him his his [sic] Family Service Plan [("FSP")]. And because they could not give him an FSP, he cannot be held responsible for its non-compliance. But this logic would require the flawed belief that Father need not be held accountable for caring for his children if he cannot be found. *See [i]d.*, at 111-114. In actuality, Father had already thought his rights were terminated. *Id.*, at 203; [sic] 218. Similarly, because Father chose not to attend Dr. O'Hara's psychological evaluation, the expert doctor must be prevented from "speculating" about Father's parenting skills.[4]

Insofar as the FSP goals are concerned, Father claims that evidence of his completion of domestic violence programs was destroyed when he went on [the] run. *Id.*, at 170. He also claims that he did not comply with the FSP goals because he first needed a job. *Id.*, at 179. He also

blamed CYF for not communicating with him. ***See, e.g.***, [N.T., 10/14/15], at 215. He stated that the CYF caseworker was always on vacation. ***Id.***, at 187. He said that calling CYF's office was a "hassle." ***Id.*** The [trial court] notes that CYF served Father with the TPR petitions on March 20, 2015. At least as § 2511(a)(8) is concerned, [the trial court] cannot consider "any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petitions." 23 Pa.C.S.A. § 2511(b). Any and all effort Father made at all in this case occurred during the short time between his most recent incarcerations: June to September 2015. ***See*** [N.T., 10/14/15], at 216.

The record is clear that the conditions that led to the removal of the [C]hildren from their [f]ather's care have remained present and unaddressed. Meanwhile, the [C]hildren have been without parental care during their entire lives. For the aforementioned reasons, CYF met its burden and established grounds for termination under § 2511(a)(2); [sic] (5); [sic] and (8).

_____

[4] Father claims that he actually showed up to Dr. O'Hara's office, but left because he did not think his kids were coming. ***Id.***, at 184-185.

Trial Ct. Op. at 5-7 (footnote in original).

We find that the competent evidence in the record supports the trial court's credibility and weight determinations regarding Section 2511(a)(2). ***Id.*** Thus, we conclude that the trial court did not abuse its discretion in terminating Father's parental rights under Section 2511(a)(2). ***In re S.P.***, 47 A.3d at 826-27.

Next, we review the termination of Father's parental rights under Section 2511(b). Our Supreme Court recently stated as follows:

> [I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include "[i]ntangibles such as love, comfort, security, and stability." *In re K.M.*, 53 A.3d 781, 791 (Pa. Super. 2012). In *In re E.M.*, [620 A.2d 481, 485 (Pa. 1993)], this Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond. *In re K.M.*, 53 A.3d at 791.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013).

Father claims that he visited with Children, purchased clothes and bicycles for them, and kept current on matters concerning them. Father weaves his third and fourth issues into his argument concerning Section 2511(b). Father contends that the trial court improperly allowed Dr. O'Hara to testify out of order, over his counsel's objection. Finally, Father argues that the trial court permitted Dr. O'Hara to speculate in his opinion as to Father, since Dr. O'Hara did not perform a psychological evaluation of Father and observe Father in an interactional evaluation with the Children.

The trial court addressed Father's argument regarding Section 2511(b) as follows:

> Father argues that [the trial court] erred when it found that termination of his rights would meet the needs and welfare of the [C]hildren. This contention is noted in paragraph two of his concise statement. But it is prudent to first discuss Father's [fourth issue].
>
> **a. Order of testimony**

- 23 -

Father alleges [the trial court] erred when it heard Dr. O'Hara's testimony regarding the needs and welfare element prior to first hearing testimony regarding whether the grounds have been established. At the trial, [the trial court] took Dr. O'Hara's testimony out of order for purposes of judicial economy. He was only available in the morning, at the beginning of the trial. It is common for [the trial court] to accommodate both lawyers' schedules and their witnesses['], upon good cause shown. Counsel for Father objected to this manner of procedure. [N.T., 10/14/15, at 15-18]. Opposing counsel noted that "needs and welfare" consideration is due under § 2511[(a)](5) and (8). *Id.* The [trial court] is keenly aware of the TPR's two-step legal analysis and is able to segregate its responsibilities accordingly. Father's contention is meritless.

### b. § 2511(b) and speculation

Returning focus now to the substance, [the trial court] found that terminating the [f]ather's parental rights served the needs and welfare of the [Children]. The [C]hildren reside in the home of their pre-adoptive foster parents[,] T.L. and his wife[,] L.M. ***See*** [N.T., 10/14/15], at 102. T.L. is the [C]hildren's biological [maternal] uncle. Dr. O'Hara conducted an [interactional] between the [C]hildren and their foster parents. ***See*** CYF Exhibit A, Psychological Evaluation Report, dated September 30, 2015. The foster father demonstrated positive parenting skills. *Id.* He stated that he loves the [C]hildren as his own. *Id.* He also reported to Dr. O'Hara that the [C]hildren are happy, and that they have no concerning problems, through [sic] they were cranky during the evaluation. *Id.* The foster parents have two other children. *Id.* Dr. O'Hara ultimately opined that the benefits of the adoption, including a sense of safety, security, and stability, outweigh any possible detriment associated with the termination of Father's rights. *Id.* Dr. O'Hara's recommendation is made with a reasonable degree of psychological certainty. *Id.*

Father argues that Dr. O'Hara's testimony was pure speculation because he never met with Father. This

contention is noted in Father's [third issue]. Recall that Father allegedly went to Dr. O'Hara's office on the day of the evaluation, but chose to leave after allegedly learning that the [C]hildren would not be there. Dr. O'Hara stated that he was able to form his expert opinion based on collateral information. This includes, among other things, Father's criminal history. It can be argued that Father conceded Dr. O'Hara's use of his criminal history as a criterion when Father stipulated to said criminal record during Dr. O'Hara's testimony. *See* [N.T., 10/14/15], at 29. Dr. O'Hara also based his opinion on the fact that Father was not visiting the [C]hildren, as reported to him by CYF. He was not aware that Father was having alleged informal visits. *Id.*, at 58. Critically, however, Dr. O'Hara testified that his opinion would not change even if he knew Father had informal visits. *Id.*, at 62.

Father has never provided for the [C]hildren any of their developmental, emotional, or physical needs. Dr. O'Hara's [sic] testified that he did not have sufficient evidence that Father is in any position to appropriately care for the [C]hildren's needs and welfare. *Id.* at 46. He further testified that he does see evidence that the [C]hildren are exhibiting secure components of secured passions with their kinship foster parents and they are in placements that are stable. *Id.* The [trial court] agrees. Termination would clearly meet the [C]hildren's needs and welfare.

## D. CONCLUSION

After a careful review of all the evidence set forth above, [the trial court] concluded that CYF had carried the burden of proving by clear and convincing evidence that Father's rights should be terminated and that the child's best interests would be served thereby. CYF firmly established the grounds for termination and that termination best serves the [C]hildren's needs and welfare. Furthermore, the [trial court] did not error [sic] by proceeding with Dr. O'Hara's testimony, nor was this testimony speculative in nature. . . .

Trial Ct. Op. at 7-10.

We have stated that it is appropriate to consider a child's bond with his or her foster parents. *See In re T.S.M.*, 71 A.3d at 268. This Court will not prolong instability for children when it is clear that their biological parents are unable to provide for their basic needs in the near future. *See id.* at 270. As we stated in *In re Z.P.*, 994 A.2d 1108 (Pa. Super. 2010), a child's life "simply cannot be put on hold in the hope that [a parent] will summon the ability to handle the responsibilities of parenting." *Id.* at 1125. Rather, "a parent's basic constitutional right to the custody and rearing of his or her child is converted, upon the failure to fulfill his or her parental duties, to the child's right to have proper parenting and fulfillment of his or her potential in a permanent, healthy, safe environment." *In re B., N.M.*, 856 A.2d 847, 856 (Pa. Super. 2004).

We find that the competent evidence in the record supports the trial court's credibility and weight determinations. As the trial court's factual findings are supported by the record, and the court's legal conclusions are not the result of an error of law or an abuse of discretion, we affirm the trial court's decision with regard to subsection (b). *In re S.P.*, 47 A.3d at 826-27. Further, we find that for the reasons expressed by the trial court, the court did not err in allowing Dr. O'Hara to testify out of order and by accepting his testimony without (1) an interactional evaluation between Father and the Children and (2) an individual evaluation of Father.

Accordingly, we affirm the trial court's orders involuntarily terminating Father's parental rights.

Orders affirmed.

President Judge Gantman joins the memorandum

Judge Olson concurs in the result.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 7/15/2016